UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHRISTOPHER HOWARD,

                Petitioner,                    Case Number 1:06-CV-14272
                                                Honorable Thomas L. Ludington

v.

KURT JONES,

                Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS
CORPUS, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY,
AND DENYING LEAVE TO APPEAL IN FORMA PAUPERIS**

      Petitioner Christopher Howard, a Michigan state prisoner, has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Following a jury trial in the Oakland County Circuit Court, Petitioner was convicted of first-degree premeditated murder, Mich. Comp. Laws § 750.316(a), and was sentenced to life imprisonment without parole. In his habeas petition, he raises claims concerning the sufficiency of the evidence, the admission of certain evidence, the conduct of the prosecutor, his actual innocence based upon "newly-discovered" medical records, and the effectiveness of defense counsel. For the reasons that follow, the Court will deny the petition. The Court will also deny a certificate of appealability and leave to proceed in forma pauperis on appeal.

I

      Petitioner's conviction arises from the death of his wife, Marie Irons, at her home in Southfield, Michigan on December 29, 2002. The Court adopts the summary of the trial testimony provided by defense counsel on direct appeal to the extent it is consistent with the record. Those facts are as follows:

Defendant and Irons were married and had one son, C.J., who was two at the time of the murder.  Also living with the couple was Irons' son from a former marriage, Gregory.  On Fridays, Irons' mother, Johnella Moses, babysat C.J, while Irons was at work.  Defendant and Irons met at a conference in Texas and were married on October 9, 1999, Irons was the director of technology for the Pontiac Schools, while defendant worked for a computer company.  Moses claimed that defendant stole money from her husband's company. In December, 2002, defendant was hospitalized because "he was acting crazy again."  According to Moses, Irons packed defendant's car with his clothes and left it at the hospital. When defendant was discharged, he wanted to move back into the marital home, but Irons and her two sons moved in with Moses. Moses claimed Irons was going to file for divorce "that Monday."

Moses told jurors about a conversation she had with defendant around Thanksgiving, 2002 in which she accused defendant of taking advantage of Irons and told defendant "[I]f you don't stop the nonsense, you're going to lose your family."  Defendant replied "I'll never lose them. I'll kill them before I lose them."  Moses immediately told Irons, and Irons began to stay either with her sister and brother-in-law or with Moses.

On December 23, 2002, Irons got a personal protection order (PPO), because she was afraid of defendant, and moved back into the marital home. Moses claimed that Irons had alleged that defendant had sent word that "I have the children's coffins" and that he was upset because he did not have more say in raising Irons' older son Gregory. The home was alarmed, but not on the basement windows, and Irons changed the locks twice, once after defendant was discharged from the hospital and again after she obtained the PPO. Moses later told Southfield Police that there had been "a lot of trouble" between Irons and defendant, that there had been threats made to both Irons and her family, there had been a dispute over money and that it had been alleged that defendant had stolen a large sum of money from her husband's business.

Over defense objection, Dawn Hasselbach, C.J.'s nanny, testified that between November and December, 2002, she talked to Irons about the state of her marriage, and that on December 20, 2002, Irons called to ask her to board the family dog because defendant had "been let out on bond from something previous," she was afraid and she was going to her mother's house.  On December 24, 2002, Irons called Hasselbach to ask for the dog back so that she, her sons and the dog could celebrate Christmas at the marital home.  When Hasselbach brought the dog back, Irons showed her the PPO, and Hasselbach suggested to Irons to get a gun to protect herself.   Hasselbach testified that she suggested that Irons get a gun "because she, she was, you know, afraid of, of what might happen. She was afraid for her life."  Irons told Hasselbach she was not going to get a gun.

-2-

On December 28, 2002 between 5:00 to 7:00 p.m., defendant went to a store in Southfield to see a fillet knife and a sharpener. After the clerk gave him the knife and the sharpener, defendant asked if the store sold axes. The store did not sell axes, but the clerk showed defendant a hatchet and referred defendant to the hardware section, which had a different hatchet that was longer. Apparently, defendant bought the knife, sharpener and hatchet.

Gregory testified that in December, 2002, defendant and Irons had been arguing "over the lies that he had told her that . . . my mother had found out about" and that she was planning to sue for divorce. The arguments did not get physical, and he did not hear defendant make any threats towards Irons. At some point, Irons began to be afraid of defendant to the point that security people were hired to watch the visits between defendant and C.J. He told jurors that the family dog usually ran loose in the house at night and did not remember seeing slash marks on the blue pillow. On December 29, 2002, he was using the home office computer on the first floor while Irons and C.J. were in Irons' room. Irons went to bed at around midnight with C.J., who usually slept with her. Irons kept the door to her bedroom open during the night. Gregory went to bed at about 1:00 a.m., closing the door to his bedroom before he went to bed. Although he was a light sleeper, he did not hear anything unusual during the night, other than a noise shortly after he went to bed, "but it could have been the dog or anything." The next thing he remembered was waking up and hearing someone knocking on the front door and ringing the doorbell. He got up and went to Irons' room to wake her to tell her that someone was at the door, and found her.

At 6:30 a.m. on December 29, 2002, Romulus police were dispatched to a hotel room because defendant had called to report that he had been stabbed. After being advised that the emergency call was an open line, police forced entry into room and saw a semi-conscious black man, later identified as defendant, dressed in a white T-shirt and blue boxer shorts laying on his back on the bed with a large, deep wound on his left wrist and two or three wounds on his right wrist. A stainless steel knife with a black blade was lying by his knees. As defendant was being treated by medical personnel, Donald Smith found an Oakland County PPO in a black leather case next to the bed. After Smith read about a "significant amount of violence" in the PPO, he had the desk sergeant contact Southfield Police to conduct a welfare check of Irons' house. Defendant was eventually taken to the hospital, where Romulus police took him into custody at the request of Southfield police. A later search of defendant's room turned up four or five letters police believed were suicide notes, medication, and a hatchet found between the box spring and mattress pad, among other things. Police seized defendant's keys and his "athletic-type" shoes.

Southfield police dispatched to the marital home on a welfare check rang the doorbell and knocked on the door and getting no answer, began to walk around

-3-

the house to check for signs of forced entry, and noticed what appeared to be fresh footprints in the snow leading towards the back of the house. They noticed that a screen on the rear basement window had been cut, and that the window was unlocked, but closed. As police prepared to enter the house through the basement window, they heard someone running down the stairs, so they ran around to the front, and were met by Gregory, who said that his mother was upstairs in the bedroom, bleeding from the neck. Irons appeared to be dead in the master bedroom, laying partially out of bed with her head and arms near the floor with a large gash on the left side of her neck. A great deal of blood was underneath her head. It did not appear that there had been a struggle. Beside her, a small child was sleeping. Police grabbed him and took him downstairs.

Police found a blood "droplet" on the carpet in the upstairs hallway, a blue pillow that had been cut in a spare bedroom, blood stains where Irons was found and blood spatter on the wall and ceiling. Bloodstains were found on the top of a dresser, on a night stand, the bed, bed clothes, headboard, wall above the headboard and picture above the headboard and on the floor. Chris Helgert determined that castoff spatter on the ceiling was consistent with Irons' wounds because they traveled in opposite directions. Arterial spurt was found in two locations on the wall behind the headboard near the bedpost, supporting Helgert's hypothesis that Irons' carotid artery was cut as she lay in bed.

Police lifted several fingerprints [some of which matched those of petitioner] from the inside of the basement window. They found a green duffel bag containing a calculator, black marker, cologne, airline ticket stub, knife sharpener, screwdriver, cigarette adapter, rubber gloves and clothes in the basement. They later impounded and searched defendant's car and found a leather hatchet cover on the front seat, instructions for a knife sharpener on the passenger side floor and medical documents. There was no blood in the car. They photographed the footprints leading to the basement window.

Pete Simerly testified that it appeared to him that Irons had been laying on her shoulder when she was struck, based on the wounds she suffered. Helgert testified that it appeared to him that Irons was laying on her back looking toward the ceiling when she was struck, based on the arterial spurt. Helgert could not reconcile his "opinion" with Simerly's "opinion."

Oakland County Medical Examiner Valery Alexandrov performed Irons' autopsy, which revealed two huge wounds bearing features of both cut and stab wounds in that the edges were clean, very deep, and longer than deep and deeper than long, leading him to conclude that they were inflicted by a sharp blade object. The first wound was four inches long and went very deep into the neck, severing the carotid vein and carotid artery. The second wound was so deep that it extended to the spine, severed the spinal cord and looked like a partial decapitation.

Forensically, both wounds were classified as chopped wounds. Dr. Alexandrov opined that the wounds were consistent with being inflicted in a reclining position by someone standing over them because they were in the same location and appeared to have been inflicted within seconds of each other.

Dr. Alexandrov offered a third opinion of the position of Irons' body when she was attacked: on her back with her head turned to the right, or she could have been sleeping on her side, but the most important thing was that her head was turned in such a way that it exposed the left side of her neck. Either wound would have been fatal. No defensive wounds were noted. According to Dr. Alexandrov, Irons' death was a homicide caused by multiple chop force wounds to the neck. In his opinion, the wounds would have been inflicted with "enormous" force because a bone's density is close to the density of oak wood. He could not estimate the amount of blood loss. He theorized that a terminal jerk occurring after the attack caused her body to wind up in the position in which police found it.

Shortly after defendant was released from the hospital and taken to the Southfield Police Department, Helgert interrogated him "to determine his involvement in this murder." During a first interrogation that began at 2:10 p.m. on December 29, 2002, defendant told Helgert about his activities beginning on December 28, 2002. He woke up, did some work for a client in his hotel room, went to the post office to pick up some Christmas presents his mother had mailed to his children and went to pick up some money that had been wired to him. Since defendant knew he could not drop the presents at the marital home because of the PPO, he drove there, found an unknown couple, and asked them to leave the presents on the porch. He then went to a movie theatre and bought a ticket for a future film, ate lunch and went to a microbrewery, where he shot pool and drank dark beer. Defendant remembered talking to his parents, remembered driving, but not where he drove, remembered a sign saying "Cleveland," and remembered waking up bleeding in his hotel room.

During this first interrogation, defendant told Helgert that the last time he had been in the marital home was "on the Monday before Christmas," when he was hospitalized and that on December 23, 2002, Irons had served him with the PPO, had told him that she was going to divorce him because she was upset with him for failing to "make a meeting" about investment or banking issues and because she had learned that defendant had lied about the parentage of a daughter from another marriage. Defendant told Helgert upon his discharge from the hospital, he learned that Irons had packed his bags, put them into his car and had made a tentative reservation for him at the Red Roof Inn. Defendant told Helgert that he had written some checks from a company account for money he thought was available to him that ultimately bounced, opened up a credit of comparison card account in Irons' name without her knowledge, and had run up a $30,000 balance.

-5-

Defendant did not ask about Irons during this first interrogation, even when shown a wedding photograph and a Polaroid photograph of Irons "in her death mask in the bed with the wounds to her neck and the blood, deceased," other than to say "if I did that, I'll die or I'll be dead." At one point, he told Helgert that he thought he had taken care of all of his outstanding traffic tickets.

Defendant told Helgert that Irons had changed the locks on the marital home, but gave him keys to fit them and that the code to the home alarm had not changed. He denied putting the family dog into a crate in the basement.

Defendant told Helgert during the first interrogation that he met a man named Ralph while checking in to the Red Roof Inn who commented that it appeared that he was having a hard time, and suggested taking up hunting and camping because it was peaceful. Defendant said that "Ralph" told him that he was going out of town, but would take him camping and hunting when he returned, and that he should assemble a camping kit in the meantime. Defendant first went to a store in Highland Township and saw a camping kits containing a small axe, knife, sharpener and lighter fluid but it was too expensive, so he decided to assemble the kit himself using less expensive items. When Helgert pressed defendant about when or where he bought the hatchet, defendant said he did not remember buying one, but could not say that he did not buy one. He could not remember the sheath, either. Defendant told Helgert that he had gone to K-Mart in Southfield to buy a knife and two screwdrivers to change some fuses in his car. Defendant thought he had bought the sharpener "some time ago" and identified the green duffel bag as his. Defendant did not know how blood had gotten onto the knife.

This first interrogation "was not especially productive" for Helgert because "we did not come to the point of discussing the homicide per se," so he attempted a second one on December 30, 3002. Apparently, defendant had told a "uniform turnkey" that he woke up thinking "all kinds of thoughts." During this interrogation, defendant told Helgert that he remembered talking to Irons on the telephone and that they had agreed to discuss the future, the divorce and the children, but that Irons had wanted to wait until the children were in bed. At about 2:30 a.m. or 3:00 a.m., Irons called and told him that Gregory had finally gone to bed and that he could come over. Irons let him in through the front door. Defendant had brought the green bag containing the knife, hatchet, knife sharpener and rubber gloves that he had purchased for camping and cleaning so that he could fill it with items of his from the basement. Irons had already "crated" the family dog in the basement. Defendant told Helgert that shortly after he began collecting his possessions in the basement, he and Irons had a very loud argument, with Irons saying that he would never see the children again, that she was going back to her first husband and that defendant was not half the man that her first husband was. These comments made defendant unhappy.

-6-

Defendant told Helgert that the next thing he remembered was standing at the foot of the basement stairs with the knife in one hand and the hatchet in the other. Defendant next remembered standing in the first floor foyer with papers in one hand and the bloody fillet knife and bloody hatchet in the other. He remembered thinking "did I do something, could I have done this." Defendant told Helgert that he left the house via the front door, got in the car, put the hatchet and knife on the seat next to him and drove to Romulus. ( Once back at his hotel room, defendant took medication because he had a headache, went to bed, and awoke bleeding. When Helgert told defendant that he did not believe his story of not remembering "the act of killing her," defendant denied killing Irons, saying that there was a void that he did not remember. Defendant did not admit to committing the homicide in either interrogation.

Helgert testified that this was the last time he interrogated defendant. He told jurors that he then drafted four search warrants to search the marital home twice, the Romulus hotel and defendant's car "to ensure that the defendant's rights are protected." On December 30, 2002, he went to the marital home and tried to open it with the keys found in defendant's Romulus hotel room, but none fit any of the locks.

Defendant told jurors he and Irons met in April, 1998 at a conference in Dallas, Texas, moved to Michigan after they became engaged, were married on October 9, 1999, the second marriage for both. Irons knew about his two daughters from his prior marriage. He had met Irons' first husband and had no problems with him, although he became angry when Irons told him that she planned on returning to him. He felt that he and Irons had a good marriage "up until the point of December." He worked, Irons had a fulltime job and they jointly owned and paid for the marital home. He testified that claims that C.J. routinely slept with Irons were incorrect, explaining that if he woke up before 4:00 a.m., they put him back to bed in his own room, but after 4:00 a.m., they let him sleep with them.
Defendant testified that he and Irons had a joint account and each had separate accounts of "play money." He denied Moses' claim that he was taking money, telling lies and cheating people and denied that she confronted him with her suspicions. He acknowledged working for Moses' husband's company, explaining that his Massachusetts-based company did contract work implementing and supporting the company's accounting software from December, 2002 until November, 2003. He never actually worked for Moses' husband's company, never ran that company, but acknowledged having access to the company's accounts. He denied taking money from Moses' husband's company. His company was paid directly by Moses' husband's company, and he received his paycheck from the Massachusetts-based company.

Difficulties in the marriage began in late December, 2002 because Irons was worn down with the negative things her family told her about defendant and with his

illness to the point that she wanted a divorce.  He was hospitalized for a combination of physical and mental ailments for a week and when he was discharged, Irons told him that she wanted a divorce and he went to a hotel where Irons had made reservations for him.  The news made him depressed and confused because there had been no discussion about a divorce before he went into the hospital.  Losing his wife "period" was worse than losing his wife to her first husband.

On the advice of his attorney, defendant went back to the marital home "the Friday after me being released," found that the locks had been changed, so he called police, and ultimately called Irons, who gave him a key, but went to stay with Moses.  He denied telling Moses that he would kill his family before losing them.  Defendant testified that he had to cut one of the screens to the basement window with a pair of cutting pliers and entered the house through an unlocked basement window.  The alarm did not go off because the basement windows did not have alarm circuits on them.  After he discovered that several of the basement windows were unlocked, he locked them all "that Saturday."

Defendant stayed alone at the marital home for three days before being served with the PPO on "the Monday before Christmas," causing him to leave and taking up residence at a hotel, but he still spoke to Irons on the telephone, mainly about visiting C.J. in public places for an hour or so.  He visited C.J. twice before Irons died and hand no idea "security people" had been hired for these visitations.
Defendant explained how he came to buy the hatchet, knife and sharpener. On the one night he stayed at the Red Roof Inn, he met and went out to dinner with "Ralph," who suggested that he try camping and "getting into the outdoors" and recommended a store that sold camping kits.  After dinner, they exchanged telephone numbers, and "Ralph" promised to take him camping the next time he went "up north."  Defendant told jurors that he had been camping "maybe twice" in his entire life and owned a sleeping bag.

On "that Saturday," defendant went to the store to assemble a camping kit.  He had initially gone to get a thin knife so that he could get a fuse out of his car.  After he had seen a camping kit at another store, he also planned to get similar items, such as lighter fluid, an axe, a sleeping bag, a knife and a "starter" to "start flames," for his kit.  He bought the axe to "produce firewood on a camping trip."  He acknowledged buying the knife sharpener, but did not recall using it to sharpen the axe.  When he bought the knife and the axe, he never thought to murder Irons or harming the children with them and had no thoughts of ending his own life.

Defendant testified that during a midnight telephone call on December 28, 2002, Irons agreed to meet with him at the marital home to make arrangements to visit C.J. and to "sit down and talk," and was let into the residence by Irons through the

-8-

garage.  Gregory had already gone to bed. The hatchet and knife made their way into the house because defendant wanted to use the bag they were in to retrieve casual clothes from the marital home.  He had no intention of killing Irons or killing himself in front of Irons.

Defendant made a last-ditch effort to reconcile, but Irons would have none of it, so they started to talk about the divorce.  The conversation did  not last more than 30 minutes.  Defendant felt terrible and angry that Irons did not want to reconcile and was not sure that it made him angry enough to take an axe and attack her. The conversation escalated into a loud argument.  He did not remember anything after the argument.

Defendant told jurors that he believed that he was responsible for causing Irons' wounds, but did not plan them.  He had no memory of anything because "we were in a heated argument when I went downstairs to the basement" and he was having migraine headaches.  He did not remember going up to the second floor, but believed he went there.

He did not recognize the blue pillow and did not recall cutting it.  He did not remember chopping anything in the marital home or raising the axe.  He did not remember if C.J. was in bed with Irons and wound not have intentionally or premeditatedly killed Irons if he knew C.J. had been there.  He could only remember holding a bloody hatchet and the letters in the foyer.

He could not explain why he did not just walk away, except to say "I was walking away from Marie and going downstairs."  He remembered leaving, taking the "murder weapons" with him, but could not remember where the axe went.
Defendant did not know how it was that he woke up bleeding and did not remember cutting his wrists.  He did not recall thinking that he was going to kill himself, did not know how his wrists got cut, but believed at trial that they were self-inflicted.  He told jurors that the notes found in his room were not suicide notes.  He further testified that when he initially talked to police. he did not have any memory of what really happened at the marital home.

Brief of Defendant-Appellant at 1–16, *People v. Howard*, No. 251017, 2005 WL 155890 (Mich.

Ct. App. Jan. 25, 2005) (per curiam) (footnotes and internal citations omitted).

Following his conviction and sentencing, Petitioner filed an appeal as of right with the

Michigan Court of Appeals asserting that:  (1) the prosecution presented insufficient evidence to

support his first-degree murder conviction; (2) the trial court abused its discretion by allowing a

police officer to provide a lay opinion regarding footprints found outside the victim's home; (3) the trial court erred in admitting witness testimony of the victim's statements about fearing Petitioner; (4) the prosecutor engaged in misconduct by appealing to the jury's sympathy for the victim; and (5) the trial counsel was ineffective for failing to object to those arguments. The court denied relief on the claims and affirmed Petitioner's conviction. *People v. Howard*, No. 251017, 2005 WL 155890 (Mich. Ct. App. Jan. 25, 2005) (per curiam) (unpublished). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied. *People v. Howard*, 703 N.W.2d 811 (Mich. 2005).

In 2006, Petitioner filed an initial habeas petition with this Court, which was ultimately held in abeyance to allow him to exhaust additional claims in the state courts.

Petitioner then filed a motion for relief from judgment with the state trial court asserting that: (1) trial counsel was ineffective for failing to investigate his case and present evidence to support his theory of the case; (2) his conviction should be overturned due to newly-discovered evidence which suggests that the victim's death was caused by a psychotic break and not premeditation thereby establishing his actual innocence; and (3) he was denied a fair trial due to cumulative error. The trial court concluded that Petitioner had failed to establish good cause and actual prejudice under Michigan Court Rule 6.508(D)(3)(a) and (b) and denied the motion. *People v. Howard*, No. 03-189534-FC (Oakland Co. Cir. Ct. Dec. 20, 2006) (unpublished).

Petitioner filed a delayed application for leave to appeal in the Michigan Court of Appeals, which was denied for failure "to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Howard*, No. 283939 (Mich. Ct. App. Nov. 3, 2008)

(unpublished).  Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was also denied.  *People v. Howard*, 769 N.W.2d 667 (Mich. 2009).

Petitioner then moved to reopen his case in this Court and proceed on his present habeas petition, raising the same claims presented to the state courts on direct appeal and collateral review of his conviction (absent the cumulative error claim).  The Court granted his motion and reopened the case.  Respondent has since filed an answer to the petition contending that it should be denied because the claims lack merit, are not cognizable, and are barred by procedural default. Petitioner has filed a reply to that answer.

## II

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which governs this case, permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(1)–(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).

Mere error by the state court does not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable."  *Wiggins v. Smith*, 539 U.S. 510, 520–21(2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)).   Additionally, this Court must presume the correctness of state court factual determinations.  28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also*

-11-

*West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) ("The court gives complete deference to state court findings of historical fact unless they are clearly erroneous.").

A state court decision to be "contrary to" clearly established precedent, the Supreme Court explains, "if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams*, 529 U.S. at 405-06.

A state court decision involves an "unreasonable application" of clearly established precedent, the Court explains, "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

The Court cautions, however, that an unreasonable application of federal law is different from an incorrect application of federal law. Unanimously emphasizing the limited nature of this review in *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Court reiterated that AEDPA imposes a highly deferential standard for evaluating state-court rulings, writing: "A state court's determination that a [petitioner's] claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 785–86 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

-12-

### III

### A

Petitioner first asserts that he is entitled to habeas relief because the prosecution presented insufficient evidence to support his first-degree murder conviction. This assertion lacks merit.

The Federal Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The standard of review for a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted). "The Jackson standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16).

A federal habeas court views this standard through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). Thus, under the AEDPA, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review — the factfinder at trial and the state court on appellate review — as long as those determinations are reasonable. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v.*

-13-

*Lonberger*, 459 U.S. 422, 434 (1983)).  Accordingly, "[t]he mere existence of sufficient evidence to convict . . . defeats a petitioner's claim."  *Matthews*, 319 F.3d at 788-89.

Under Michigan law, first-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. See People v. Kelly, 231 Mich. App. 627, 642, 588 N.W.2d 480 (1998); Mich. Comp. Laws § 750.316. Premeditation and deliberation may be established by evidence showing:  "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide."  People v. Schollaert, 194 Mich. App. 158, 170, 486 N.W.2d 312 (1992); see also People v. Abraham, 234 Mich. App. 640, 656, 599 N.W.2d 736 (1999).  Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, see People v. Jolly, 442 Mich. 458, 466, 502 N.W.2d 177 (1993), including the defendant's intent or state of mind.  See People v. Dumas, 454 Mich. 390, 398, 563 N.W.2d 31 (1997); see also People v. Nowack, 462 Mich. 392, 402–403, 614 N.W.2d 78 (2000).

Applying the Jackson standard, the Michigan Court of Appeals ruled that the prosecution presented sufficient evidence to establish that Petitioner acted with premeditation and deliberation in killing the victim.  The court recognized that Petitioner presented contrary evidence, but determined that conflicts in the evidence must be resolved in favor of the prosecution, and denied relief on this claim.  *Howard*, 2005 WL 155890 at *1.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.  The record reveals that the prosecution

presented sufficient evidence to establish Petitioner's guilt of the charged offense beyond a reasonable doubt.

The trial testimony indicated that Petitioner benefitted financially from his marriage to the victim, that the victim intended to divorce him and had obtained a PPO against him, that Petitioner threatened the victim, that he purchased a hatchet, a knife, and a sharpener the day before the murder, that he brought those items to the victim's house during the middle of the night and entered the house through an unarmed basement window, that he crated the victim's dog, that he struck the victim with the hatchet twice on the left side of her neck, causing instant death, and that he returned to his motel room and put the hatchet under his mattress. Such testimony provided ample evidence that Petitioner committed the crime and that he acted with premeditation and deliberation so as to support his first-degree murder conviction.

Petitioner challenges the inferences and credibility determinations made by the jury at trial. However, it is the job of the fact-finder at trial, not a federal habeas court, to resolve evidentiary conflicts. *See Jackson*, 443 U.S. at 326; *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002); Walker v. Engle, 703 F.2d 959, 969–70 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").

The jury's verdict was reasonable. As was the Michigan Court of Appeals' decision affirming that verdict. The trial testimony and evidence, viewed in a light most favorable to the prosecution, established beyond a reasonable doubt that Petitioner caused the victim's death and that he possessed the requisite intent for first-degree murder. More importantly, for purposes of

-15-

habeas review, this Court cannot say that the Michigan Court of Appeals' ruling to that effect was unreasonable. Habeas relief is not warranted on this claim.

## B

Petitioner next asserts that he is entitled to habeas relief because the trial court erred in admitting certain testimony. Specifically, he asserts that the trial court erred in admitting a police officer's lay opinion testimony about footprints found outside the victim's home and erred in admitting witness testimony about the victim's statements expressing fear of Petitioner. This claim lacks merit.

Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993). "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action, unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *McGuire*, 502 U.S. at 69–70); *see Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Accordingly, to the extent that Petitioner asserts that the trial court erred in admitting testimony under the Michigan Rules of Evidence, he merely alleges violations of state law which do not entitle him to federal habeas relief. *See, e.g.*, *Wheeler v. Jones*, 59 F. App'x 23, 28 (6th Cir. 2003). State courts are the final arbiters of state law and the federal courts will not intervene

-16-

in such matters.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002).  Habeas relief is not warranted on this claim.

## C

Petitioner next asserts that the trial court erred in admitting a police officer's lay opinion testimony about footprints found in the snow outside of the victim's home.  The officer testified that the size and pattern of the footprints was identical or nearly identical to Petitioner's shoes.  The Michigan Court of Appeals ruled that the testimony was proper and admissible under state law as lay opinion testimony under Michigan Rule of Evidence 701.  *Howard*, 2005 WL 155890 at *2.  This decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof.

First, Petitioner fails to cite any federal case establishing that the admission of opinion testimony offends fundamental principles of justice, and an independent review reveals none.  Petitioner's allegation that the evidentiary rulings are "fundamentally unfair" and violate due process does not transform such state law issues into federal constitutional claims.  *See, e.g.*, *Petrucelli v. Coombe*, 735 F.2d 684, 688 (2d Cir. 1984) ("'Alleging lack of a fair trial does not convert every complaint about evidence or prosecutor's summation into a federal due process claim'").  There is generally no prohibition on a witness offering opinion testimony which goes to an ultimate issue in a case.  Both the Federal and Michigan Rules of Evidence permit such testimony.  See Fed. R. Evid. 704(a); Mich. R. Evid. 704.  Thus, there is no clearly established federal law as determined by the Supreme Court which suggests that the admission of such

-17-

evidence violates the Constitution.  *See Hopp v. Burt*, No. 03-10153, 2007 WL 162248, *9 (E.D. Mich. Jan. 16, 2007).

Second, Petitioner has not shown that the testimony was improper or that its admission violated due process.  Under Michigan law, lay opinion testimony is admissible if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  Mich. R. Evid. 701.  The opinions and reliable conclusions of investigating police officers who have not been qualified as experts have also been deemed admissible under Michigan law when the testimony is based upon observations and not dependent upon scientific expertise.  *See People v. Oliver*, 170 Mich. App. 38, 49-50, 427 N.W.2d 898 (1988).  In this case, the police officer's opinion about the footprints was based upon his police experience, his observations at the scene, and his investigation of the case.  It was proper to admit the officer's opinion, and the basis for that opinion, to assist the trier of fact in resolving the factual issues at trial.  Moreover, the trial court properly instructed the jury about the consideration of the testimony.

Petitioner does not establish that the admission of the lay opinion testimony deprived him of a fair trial or otherwise violated his constitutional rights.  *See, e.g.*, *Rhodus v. Berghuis*, No. 07-CV-15009, 2010 WL 4260092, *8-9 (E.D. Mich. Oct. 22, 2010) (denying relief on similar claim).  Habeas relief is not warranted on this claim.

**D**

Petitioner next asserts that the trial court erred in admitting witness testimony about the victim's statements expressing fear of Petitioner.  Petitioner alleges that the statements were inadmissible hearsay and that their admission violated his confrontation rights.  The Michigan

-18-

Court of Appeals denied relief on this claim finding that the statements were admissible under the Michigan Rules of Evidence and finding that the confrontation argument was unpreserved and meritless. *Howard*, 2005 WL 155890 at *3-5.

This decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. Petitioner has not shown that the admission of such testimony rendered his trial fundamentally unfair. As found by the Michigan Court of Appeals, the victim's statements concerning her fears of Petitioner were admissible under Michigan Rule of Evidence 803 to show her existing state of mind and provided circumstantial evidence of Petitioner's motive and premeditation. Petitioner has not shown that the trial court's ruling was erroneous or that it deprived him of a fair trial.

Petitioner is also not entitled to relief on his claim that the admission of the statements violated his confrontation rights. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. Const. amend. VI. The Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him. *See Davis v. Alaska*, 415 U.S. 308, 315 (1973). The Sixth Amendment protections are not so broad, however, as to exclude the admission of certain hearsay statements against a criminal defendant despite his or her inability to confront the declarant at trial. *See Maryland v. Craig*, 497 U.S. 836, 847-48 (1990).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the testimonial statement of a witness who does not appear at trial is inadmissible unless the witness is unavailable to testify and the defendant has had a prior opportunity to cross-examine the

-19-

witness.  Testimonial statements include preliminary hearing testimony, grand jury testimony, prior trial testimony, and statements made during police interrogations.  *Id*. at 54.  Testimonial statements do not include remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy.  *Id*. at 51–52, 56; *United States v. Martinez*, 430 F.3d 317, 328-29 (6th Cir. 2005); *see also United States v. Stover*, 474 F.3d 904, 912-13 (6th Cir. 2007).  The victim's statements to family members and friends were non-testimonial in nature.  The Confrontation Clause is not implicated.

## D

Petitioner next asserts that he is entitled to habeas relief because the prosecutor engaged in misconduct by appealing to jurors' sympathies for the victim during closing and rebuttal arguments.  In particular, he objects to the prosecutor's remarks about obtaining "justice for Marie" and giving Petitioner "what he deserves."  Petitioner further asserts that trial counsel was ineffective for failing to object to those remarks.

To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  The Sixth Circuit has adopted a two-part test for determining whether prosecutorial misconduct violates a defendant's due process rights.  *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing cases).  First, the court must determine whether the challenged statements were indeed improper.  *Id*. at 452.  Upon a finding of impropriety, the court must decide whether the statements were flagrant.  *Id*.  Flagrancy is evaluated based on: (1) whether the statements tended to mislead the jury or prejudice the accused; (2) whether the statements were isolated or among a

series of improper statements; (3) whether the statements were deliberately or accidentally before a jury; and (4) the total strength of the evidence against the accused. *Id.*; *see also Boyle v. Milton*, 201 F.3d 711, 716 (6th Cir. 2000) (citing *United States v. Francis*, 170 F.3d 546, 540–50 (6th Cir. 1999)).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Id.* at 687. A petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." *Id.* at 788.

The Michigan Court of Appeals denied relief on these claims, finding that Petitioner failed to object to the prosecutor's disputed arguments at trial, that those arguments were based

-21-

upon the evidence and were appropriate, and that trial counsel was not ineffective for failing to object to the prosecutor's statements. *Howard*, 2005 WL 155890 at *4-6.

This decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law. It is well-settled that a prosecutor may not make remarks "calculated to incite the passions and prejudices of the jurors." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). A prosecutor improperly invokes the passions and prejudices of the jury when he or she "calls on the jury's emotions and fears — rather than the evidence — to decide the case." *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008).

In this case, to the extent that the prosecutor's comments were improper, they were not so flagrant as to render the trial fundamentally unfair. Moreover, any potential prejudice to Petitioner was mitigated by the fact that the trial court properly instructed the jurors on the law, explained that the attorneys' comments were not evidence, and directed them not to let sympathy or prejudice influence their decision. *See Knapp v. White*, 296 F. Supp. 2d 766, 776 (E.D. Mich. 2003). Petitioner has failed to establish that the prosecutor engaged in misconduct which rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

Likewise, Petitioner cannot establish that he was prejudiced by counsel's conduct. Defense counsel cannot be deemed deficient for failing to make a futile objection or motion. *See United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000). Petitioner has not shown that trial counsel was ineffective under the *Strickland* standard. Habeas relief is not warranted on this claim.

**E**

Petitioner next asserts that he is entitled to relief because he is actually innocent. Specifically, he believes that "newly-discovered" medical records (from care he received several days before the crime) would show that his actions in killing the victim were the result of a psychotic break and not premeditation and deliberation. Respondent contends that this claim is barred by procedural default, not cognizable, and lacks merit.

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court held established that claims of actual innocence based on newly discovered evidence "have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). The Court explained that "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution — not to correct errors of fact." *Id*.

In *House v. Bell*, 547 U.S. 518, 555 (2006), the Court declined to answer the question left open in *Herrera* — whether a habeas petitioner may bring a freestanding claim of actual innocence outside the death-penalty context. *Id*. at 555 (noting that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no state avenue open to process such a claim").

Following *Herrera* and *House*, the Sixth Circuit holds that a free-standing claim of actual innocence based upon newly discovered evidence does not warrant federal habeas relief. *Wright v. Stegall*, 247 F.App'x 709, 711 (6th Cir. 2007) ("Since the Supreme Court has declined to recognize a freestanding innocence claim in habeas corpus, outside the death-penalty context,

-23-

this court finds that [the petitioner] is not entitled to relief under available Supreme Court precedent."); *see also Sitto v. Lafler*, No. 06–2203, 2008 WL 2224862, *1 (6th Cir. May 28, 2008) (same). Consequently, Petitioner's claim that he is actually innocent and has newly-discovered evidence to prove his innocence fails to state a claim upon which habeas relief can be granted.

### F

Lastly, Petitioner asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to properly investigate his case and present additional evidence in support of his defense theory.

Federal habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72, 85–87 (1977). The doctrine of procedural default is applicable when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); *see also Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir. 2001). The final reasoned state court judgment should be used to make this determination. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If the final state court judgment is an unexplained denial of relief, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id*.

Petitioner first properly presented this claim to the state courts in his motion for relief from judgment. The Michigan Supreme Court denied relief pursuant to Michigan Court Rule 6.508(D), which provides, in part, that a court may not grant relief to a defendant if the motion

-24-

for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom. *See* Mich. Ct. R. 6.508(D)(3). The Sixth Circuit has held that the form order used by the Michigan Supreme Court to deny leave to appeal in this case is unexplained because its citation to Michigan Court Rule 6.508(D) is ambiguous as to whether it refers to a procedural default or a rejection on the merits. *See Guilmette v. Howes*, 624 F.3d 286, 291-92 (6th Cir. 2010) (en banc). Consequently, under *Guilmette*, the Court must "look through" the unexplained order of the Michigan Supreme Court to the state trial court's decision to determine the basis for the denial of state post-conviction relief.

In this case, the state trial court denied relief on procedural grounds. The trial court cited Michigan Court Rule 6.508(D)(3)(a) and (b) and concluded that Petitioner had not established good cause for his failure to raise the claim on direct appeal or actual prejudice. Accordingly, this ineffective assistance of trial counsel claim is procedurally defaulted.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 750–51 (1991); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Gravley v. Mills*, 87 F.3d 779, 784–85 (6th Cir. 1996).

Petitioner asserts ineffective assistance of appellate counsel as cause to excuse his procedural default. It appears that Petitioner did not raise the issue of ineffective assistance of appellate counsel in his motion for relief from judgment before the state trial court, and first raised the issue before the state appellate courts. To the extent that he did not properly exhaust

-25-

the ineffective assistance of appellate counsel issue in the state courts, he has defaulted that issue and it may not serve as cause to excuse his procedural default here.  *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Jacobs v. Mohr*, 265 F.3d 407, 417–18 (6th Cir. 2001).

Moreover, even if Petitioner has sufficiently exhausted the issue, he has not shown that appellate counsel was ineffective.  As noted, in order to establish ineffective assistance of counsel, the petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).  The Supreme Court explains:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy . . . .  Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id*. at 754.  Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel."  *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751–52).  "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome."  *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).

Petitioner does not show that by omitting the ineffective assistance of counsel claim presented in his motion for relief from judgment, appellate counsel's performance fell outside the

-26-

wide range of professionally competent assistance. Appellate counsel presented legitimate issues on direct appeal, including claims concerning the sufficiency of the evidence, the admission of certain evidence, the conduct of the prosecutor, and the effectiveness of trial counsel. Such issues, although ultimately unsuccessful, were substantial. The issues presented in the motion for relief from judgment are not obviously stronger than the ones raised by appellate counsel on direct appeal. Petitioner has failed to demonstrate that appellate counsel was ineffective so as to establish cause to excuse his procedural default. The Court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default. *See Smith*, 477 U.S. at 533; Long v. McKeen, 722 F.2d 286, 289 (6th Cir. 1983).

Finally, Petitioner has not demonstrated that a fundamental miscarriage of justice has occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *See Murray v. Carrier*, 477 U.S. 478, 479–80 (1986). To be credible, such a claim of actual innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Actual innocence means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Petitioner does not make such a showing. First, his own medical records are not "newly-discovered," given that he was aware of his medical treatment at the time of trial. (Moreover, to the extent that any undisclosed records are new, Petitioner has failed to provide them.) Conclusory allegations, without evidentiary support, do not provide a basis for habeas relief. *See Cross v. Stovall*, 238 F. App'x 32, 39–40 (6th Cir. 2007). Second, any medical records regarding his medical care a week or more before the crime do not establish that he was unable to form the

requisite intent at the time of the crime.  And third, and any such medical records would merely go to legal insufficiency, not factual innocence.  It is undisputed that Petitioner killed the victim. Petitioner has failed to establish that a fundamental miscarriage of justice has occurred.  This claim does not warrant habeas relief.

## IV

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue.  *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a court rejects a habeas claim on the merits, the substantial showing threshold is met if Petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000).  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.* at 336–37.  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

Petitioner has not demonstrated a substantial showing of the denial of a constitutional right.  Accordingly, a certificate of appealability is not warranted in this case.  The Court further concludes that Petitioner should not be granted leave to proceed in forma pauperis on appeal, as any appeal would be frivolous.  *See* Fed. R. App. P. 24(a).

-28-

**V**

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus (ECF No. 1) is

**DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED**.

It is further **ORDERED** that permission to proceed in forma pauperis on appeal is

**DENIED**.

Dated: May 8, 2012

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney of record herein by electronic means and upon Christopher Howard, #468574, at Lakeland Correctional Facility, 141 First Street, Coldwater, MI 49036 by first class U.S. mail on May 8, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS

---